EMN:JMK
F.#2011R00976

**M 11-1210**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    -against-

JOSEPH JOEL DICOSTA,
    also known as
    "Joe" and "Joel,"

        Defendant.

- - - - - - - - - - - - - - - - - X

**To Be Filed Under Seal**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF ARREST WARRANT
(T. 18, U.S.C., § 1955)

EASTERN DISTRICT OF NEW YORK, SS:

    JONATHAN MELLONE, being duly sworn, deposes and says that he is a Special Agent with the U.S. Department of Labor, Office of Inspector General, Office of Labor Racketeering and Fraud Investigations, duly appointed according to law and acting as such.

    Upon information and belief, in or about and between January 2003 and January 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH JOEL DICOSTA, also known as "Joe" and "Joel," together with others, did knowingly and intentionally conduct, finance, manage, supervise, direct and own all or part of an illegal gambling business, that is: a gambling business involving bookmaking, which operated in violation of the laws of New York State, to wit: New York Penal Law Sections 225.05 and

20.00, which involved five or more persons who conducted, financed, managed, supervised, directed and owned all or part of such business and which remained in substantially continuous operation for a period in excess of thirty days and had a gross revenue of at least $2,000 in any single day.

(Title 18, United States Code, Sections 1955(a) and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:

1. I have been a Special Agent with the U.S. Department of Labor, Office of Inspector General, Office of Labor Racketeering and Fraud Investigations ("DOL-OIG") for approximately 10 years. During my tenure with DOL-OIG, I have been involved in various criminal investigations involving organized crime and illegal gambling activity. These investigations have utilized, among other investigative techniques, the use of physical and electronic surveillance, execution of search warrants of illegal gambling operations, consensual recordings, wiretap interceptions regarding illegal gambling and debriefing of confidential sources. Through my training, education and experience, I have become familiar with organized crime activities, including illegal activities involving different forms of illegal gambling.

2

2. I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) information obtained from a cooperating witness, (c) information obtained from other law enforcement agents, and (d) bank records. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge. In addition, when I rely on statements made by others, such statements are set forth in part and in substance unless otherwise indicated. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendant JOSEPH JOEL DICOSTA, also known as "Joe" and "Joel," I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest.

## ILLEGAL GAMBLING

3. As described herein, there is probable cause to believe that the defendant JOSEPH JOEL DICOSTA, also known as "Joe" and "Joel," together with others, participated in an illegal bookmaking business.

I. Background

4. Based on my training, experience and knowledge of this investigation, as well as information provided by other law

3

enforcement agents, I understand the following about bookmaking:

     a. Bookmaking is a type of gambling in which a bookmaker accepts bets on future contingent events, including sporting events such as NCAA and NFL football games.

     b. A bookmaker typically has a physical or virtual "office," where bets are placed. In addition to the bookmaker, there are "runners" with whom a bookmaker has a pre-arrangement to share in the profits of the bettors' losses.

     c. A runner is responsible for recruiting bettors, and will supply a code and a telephone number if there is a physical office, or an internet address to a gambling website or a telephone number if there is a virtual office, to the bettors he recruits for them to place their bets. In the case of a virtual office, the bettor will speak with operators, usually employed by an overseas gambling establishment, with whom the bettor can place bets and check on the status of his or her winnings or losses.

## II. The Bookmaking Business

    A. Bettor #1

     5. An individual who was a bettor in DICOSTA's bookmaking operation (hereinafter, "Bettor #1") provided the following information:

     6. Bettor #1 met DICOSTA in approximately 2006 through a mutual friend. A friend of Bettor #1 gave him

DICOSTA's telephone number to call for the purpose of placing bets on sports. Bettor #1 called DICOSTA to express interest in placing sports bets with him. DICOSTA set up a sports betting account for Bettor #1, and instructed him to a call an 800 number to place sports bets. DICOSTA told Bettor #1 that the 800 number was to an overseas establishment.

7. Bettor #1 proceeded to place sports bets through the account that DICOSTA set up for him. Bettor #1 placed bets by calling the 800 number given to him by DICOSTA and speaking to various operators who had foreign accents and who did not speak English well. In my training and experience, overseas gambling establishments use multiple operators to service calls from clients. DICOSTA also provided to Bettor #1 an internet address to a gambling website associated with the 800 number Bettor #1 used to place bets, but Bettor #1 rarely used the website. Bettor #1 placed sports bets with DICOSTA from approximately 2006 to 2009.

8. When Bettor #1 first began to bet with DICOSTA, he had a $500 to $1,000 limit on his account. The only way that Bettor #1 could increase the dollar amount he was allowed to bet on his account was to talk to his "agent," who Bettor #1 identified as DICOSTA. The agent would then call the 800 number and authorize the limit increase. Bettor #1 stated that when he had asked DICOSTA to increase the limit on his account, DICOSTA

told Bettor #1 that he (DICOSTA) needed to "talk to the office."

9.  In the course of placing bets with DICOSTA, DICOSTA asked Bettor #1 if he knew anyone who was interested in placing sports bets. DICOSTA explained to Bettor #1 that he (Bettor #1) could earn 10% to 20% of a bettor's losses if Bettor #1 brought that bettor to DICOSTA. Bettor #1 did not recruit any bettors for DICOSTA's bookmaking operation.

10. Bettor #1 met DICOSTA once a month in Redbank, New Jersey or somewhere in the vicinity of Redbank to "settle up" his account. The amount that Bettor #1 owed to DICOSTA varied between $200 and $6,000 per week. When Bettor #1 was not able to pay DICOSTA for his gambling losses for the week, DICOSTA told Bettor #1 that he needed to pay him because DICOSTA needed to "answer to someone." Over the course of three years, Bettor #1 lost approximately $40,000 to $60,000.

11. Bettor #1 was a financial advisor during the period in which he was placing sports bets through DICOSTA. In order to pay his gambling debts and to continue to place bets through DICOSTA, Bettor #1 came up with a scheme to defraud several of his investment clients.[1]

---

[1] Bettor #1 was subsequently arrested by New Jersey state law enforcement agents and pleaded guilty to three counts of Theft by Deception, in violation of New Jersey Statute 2C:20-4. On August 13, 2010, Bettor #1 was sentenced to a maximum of seven years' imprisonment. Bettor #1 has completed his prison sentence and is currently on probation in New Jersey.

12. Bettor #1's information has been corroborated by, among other things, DICOSTA's bank records, which show that Bettor #1 paid DICOSTA $500 with a check on or about August 9, 2007.

B. Bettor #2

13. Another individual who was a bettor in DICOSTA's bookmaking operation (hereinafter, "Bettor #2") provided the following information:

14. Bettor #2 met DICOSTA approximately 10 years ago. Approximately two years later, Bettor #2 stated to his brother that he was interested in gambling, and Bettor #2's brother stated that Bettor #2 could place bets with DICOSTA. Bettor #2's brother is a friend of DICOSTA's brother, and through him, Bettor #2's brother contacted DICOSTA to communicate Bettor #2's interest in placing bets with him.[2] DICOSTA then called Bettor #2 and set up a sports betting account for him and two friends of Bettor #2 (hereinafter, "Bettor #3" and "Bettor #4").

15. DICOSTA gave Bettor #2 an internet address to a gambling website where Bettors #2, #3 and #4 could place and track their bets. The website's name was "Forbidden Casino."

---

[2] On two to three occasions, DICOSTA instructed another bettor to deposit the money he owed to DICOSTA because of his sports betting into DICOSTA's brother's or DICOSTA's father-in-law's bank account. In my training and experience investigating illegal gambling operations, individuals who are involved in illegal gambling operations often use friends and family members to assist in collecting bettors' debts.

7

Occasionally the website's name would change. Most recently, the website's name was "Electro Casino."

16. DICOSTA also provided Bettor #2 with a telephone number that Bettor #2 believes was a number to an overseas gambling establishment, because when he called the number, the phone would "ring weird" and the operators who answered the telephone had foreign accents.

17. The sports betting account shared by Bettors #2, #3 and #4 had a $5,000 weekly limit and a $1,000 per bet limit. Bettors #2, #3 and #4 mostly placed bets on NFL football, but occasionally placed bets on professional baseball and basketball.

18. DICOSTA contacted either Bettor #2 or Bettor #3 to "settle up" any bets, meaning that Bettors #2, #3 and #4 would either pay DICOSTA their losses or collect their winnings from him. To settle their bets, Bettors #2, #3 and #4 would deposit money into DICOSTA's bank account at Wachovia/Wells Fargo bank. Bettor #2 believes that DICOSTA may have instructed the bettors to deposit money into his bank account at TD Bank prior to instructing them to deposit their money into his Wachovia/Wells Fargo bank account. Bettors #2, #3 and #4 would each deposit their checks into DICOSTA's bank account, representing each of their portions of their losses. The bettors' winnings would usually be credited to their sports betting account.

19. DICOSTA charged 10% "vig" or interest on the bettors' losses. For example, if Bettor #2 bet $100 on a sporting event, if he lost, he would owe $110 to DICOSTA. If Bettor #2 won, DICOSTA would pay him $100.

20. On several occasions, Bettors #2, #3 and #4 were late to pay DICOSTA their losses. On those occasions, DICOSTA told the bettors that he needed their money to pay the "winners," meaning bettors who had successfully placed sports bets that week. DICOSTA also told Bettor #2 that if Bettor #2 brought any new bettors to DICOSTA, he could "give [Bettor #2] something." Bettor #2 believed that DICOSTA was referring to money. Bettor #2 did not refer any bettors to DICOSTA.

21. Bettor #2 stopped betting with DICOSTA in approximately January 2011. Bettor #2 estimates that he lost approximately $30,000 by betting through DICOSTA.

22. Bettor #2's information is corroborated by, among other things, the information provided by Bettor #3 (as discussed below) and DICOSTA's bank records, which reflect payments made by Bettors #2, #3 and #4 into DICOSTA's bank account.

C. Bettor #3

23. Bettor #3 provided the following information:

24. Bettor #3 attended a party in approximately 2007 during time which he observed Bettor #2 and Bettor #4 gambling through an internet website. Bettors #2 and #4 are good friends

9

with Bettor #3, and agreed to share their sports betting account with Bettor #3. Bettor #3 stated that the website's name was "ForbiddenCasino.com." Bettor #3 further stated that the betting limit on the shared account was $20,000, with a $500 to $1,000 per game betting limit.

25. Bettor #3 would place bets with DICOSTA's bookmaking operation through the "Forbidden Casino.com" website, which he accessed using his personal laptop computer from his home on Long Island, New York. Bettor #3 paid his losses to DICOSTA by depositing either cash or money from his bank accounts from banks on Long Island into DICOSTA's bank accounts. Bettor #3 spoke to DICOSTA on the telephone frequently regarding his deposits into DICOSTA's bank accounts. For some of these telephone calls, Bettor #3 was located on Long Island. If Bettor #3 won money, DICOSTA would either credit the bettors' account or deposit money directly into Bettor #3's bank account. Bettor #3 stopped betting through DICOSTA's gambling operation in approximately 2009.

26. Bettor #3's information is corroborated by, among other things, information provided by Bettor #2 and DICOSTA's bank records. Based on DICOSTA's bank records, it appears that Bettor #3 made at least approximately $120,000 in payments to DICOSTA.

10

\* \* \*

27. Because public filing of this document could result in a risk of flight by the defendant, as well as jeopardize the government's investigation, your deponent respectfully requests that the complaint and arrest warrant be filed under seal.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant JOSEPH JOEL DICOSTA so that he may be dealt with according to law.

Dated:   Brooklyn, New York
         December 7, 2011

```
_____
JONATHAN MELLONE
Special Agent
U.S. Department of Labor, Office of
Inspector General
```

Sworn to before me this
7th day of December, 2011

_____
THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

11